Filed 12/16/24  P. v. Hardison CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>JOHN GLENN HARDISON,<br><br>    Defendant and Appellant. | F085336<br><br>(Super. Ct. No. BF180686A)<br><br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Kern County.  Brian M. McNamara, Judge.

Jennifer A. Mannix, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Eric L. Christoffersen and John Merritt, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

## INTRODUCTION

Defendant John Glenn Hardison appeals his conviction for first degree murder and related charges. Defendant makes four arguments: (1) the trial court inappropriately denied his second motion pursuant to *People v. Marsden* (1970) 2 Cal.3d 118 (*Marsden*); (2) the court failed to provide the jury with an instruction related to a heat of passion theory of voluntary manslaughter; (3) the court violated defendant's constitutional rights when it dismissed Jurors Nos. 9 and 12 for misconduct during deliberations; and (4) relatedly, the dismissal of Jurors Nos. 9 and 12 had a coercive effect on the remaining jurors. We find each of these arguments unpersuasive, and therefore affirm the conviction.

## PROCEDURAL SUMMARY

On April 17, 2020, the Kern County District Attorney filed a complaint charging defendant with the murder of Brian Dickerson (Pen. Code § 187, subd. (a); count 1);[1] unlawful possession of a firearm by a felon (§ 29800, subd. (a)(1); count 2); unlawful possession of ammunition by a felon (§ 30305, subd. (a)(1); count 3); possession of cocaine while armed with a firearm (Health & Saf. Code, § 11370.1, subd. (a); count 4); and possession of cocaine for sale (Health & Saf. Code, § 11351.5; count 5). Enhancements were also alleged in relation to count 1 pursuant to sections 189 and 12022.53, subdivision (d), related to his use of a firearm in the crime. An amended information, the operative pleading, was ultimately filed on September 16, 2022.[2]

The jury trial began on October 6 and continued until Monday, October 17. Jury deliberations lasted throughout the week, until Thursday afternoon, October 20, when the court received a note stating, "We cannot come to an agreement on Count 1. Count 2–5, we agree. What are the next steps?" The court subsequently discussed the situation with

---

[1] All further statutory references are to the Penal Code, unless otherwise stated.

[2] All further dates refer to the year 2022, unless otherwise stated.

the foreperson, who quickly revealed significant personal hostility had arisen amongst Jurors Nos. 9 and 12 during the course of deliberations.  The court then proceeded to question Jurors Nos. 1, 3, 4, 9, and 12 to determine the nature of the hostility, its impact on the jury, and whether it was improperly impeding jury deliberations.  Following the questioning and discussion from counsel, the court excused Jurors Nos. 9 and 12 and substituted in two alternates.  Deliberations resumed on the morning of Friday, October 21, with the reconstituted jury.  On Monday afternoon, October 24, the reconstituted jury again sent a message indicating it was unable to reach a verdict on count 1.  The court instructed the jurors to continue deliberating, and permitted additional argument from counsel at the jury's request.  After that, jury deliberation resumed until the afternoon of Tuesday, October 25, at which point the jury returned a verdict of guilty on all five counts.

Defendant was sentenced on November 29 to an aggregate term of 25 years to life in prison, plus 24 years, as follows:  on count 1, 25 years to life, plus an enhancement of 20 years pursuant to section 12022.53, subdivision (c); on count 2, the upper term of three years, stayed pursuant to section 654; on count 3, the upper term of three years, stayed pursuant to section 654; on count 4, the upper term of four years, stayed pursuant to section 654; and on count 5, the upper term of four years.  The sentences on counts 1 and 5 were to be served consecutively.  Various restitution and fee payments were also ordered.

Defendant timely filed a notice of appeal on November 30.

### FACTUAL SUMMARY

On April 10, 2020, the ShotSpotter system in Bakersfield detected a gunshot fired around 10:48 p.m.  Initial responding officers went first to one motel from which the system indicated the shot had emanated and, finding nothing, walked to the neighboring motel, La Mirage, at which defendant was staying.  As the officers walked to La Mirage, they encountered defendant walking out of its parking lot, and exchanged greetings.

3.

Defendant was not acting out of the ordinary, and was not detained or questioned by the officers. The responding officers located the victim, Dickersno, in the parking lot of La Mirage in front of room 111 with a single gunshot wound to the chest. Dickerson was pronounced dead at the scene.

Investigating officers at the scene located a single shell casing approximately two parking stalls away from where Dickerson's body was found. Near Dickerson's body was a 20-millimeter wrench, described alternately as a "heavy duty wrench" and a "small crescent wrench," as well as a flashlight and a tool for removing bike tires.

Someone at the motel indicated they believed the shooter was staying in room 234 of the motel, and officers went to the room and found a woman, L.S., sleeping inside. While searching the room, officers located pill bottles, mail, and paperwork with defendant's name on them. Under the bed, officers found four separate bags containing crack cocaine, scales, a razor blade, and loose rocks of crack cocaine. Several thousand dollars in cash were also found in a pillowcase on the bed. Officers testified this evidence was consistent with the selling of drugs. A firearm of a different caliber than the shell casing found outside was also found in room 234. Police then searched a Chevrolet Tahoe parked outside room 234, which was identified as defendant's vehicle. Mail in defendant's name was found inside the vehicle, listing his address as the same as that for the motel. The motel owners testified defendant was a permanent resident at the motel during April 2020.

Footage from surveillance cameras at La Mirage was played for the jury, including one facing room 111, where the shooting occurred.[3] Prior to the shooting, Dickerson was working on his bike in the parking lot. Defendant exited from his room upstairs, descended the stairs, and became involved in a verbal dispute with Dickerson. Defendant

---

[3] The video exhibits were not included in the record presented to us, and so our knowledge of what is contained on the videos comes exclusively from witness descriptions of what is depicted.

4.

then shot Dickerson once at close range, and Dickerson fell. Defendant then returned upstairs to his room, and exited again a few moments later at 10:49 p.m. The video showed officers arriving at the scene at 10:53 p.m. One of the motel owners, viewing the video with the officers, confirmed defendant was the shooter.

The motel owners testified Dickerson was known to them, but was not a resident. They had numerous problems with Dickerson, who continually harassed them despite being told to leave the property. They called the police on numerous occasions to have him removed from the property, because he was stealing things from the motel. However, even when he was arrested, Dickerson would return to the motel within a day or two.

Another motel resident, E.L., testified he knew defendant, and was present the night of the shooting. E.L. said he heard a pop "like a little firecracker going off" a little after 10:00 p.m. on April 10, 2020. According to E.L., after he came outside to see what was going on, defendant approached E.L. and asked if E.L. would help defendant get his friend into his car. E.L. refused to help, saying he did not want to get involved.

One of the motel owners recalled at trial that defendant had complained to her on April 9, 2020—the day before the shooting—that his room had been broken into. Defendant and the owner watched the surveillance tapes together, and saw one person standing outside defendant's room as a lookout while another person went inside. The victim of the shooting, Dickerson, was the lookout during the burglary.

Defendant testified in his own defense. According to defendant, he is diabetic, and around the time of the shooting was suffering from a condition called diabetic gastroparesis, which made him unable to properly digest food. Because of this condition, he had lost approximately 65 pounds, and weighed only 165 pounds at the time of the shooting, instead of his typical weight of 230 pounds. The condition left him in considerable pain, for which he was taking pain medication, and he had taken some approximately an hour and a half before the shooting. Defendant acknowledged he was a

convicted felon who had served time in prison. He sold crack cocaine in order to support himself, alongside the disability payments he received.

According to defendant, Dickerson was his cousin, who he had grown up with and was a few years younger than him. Defendant and Dickerson had gotten in a number of physical altercations throughout their lives, particularly as children, and defendant testified Dickerson was "a violent person." Defendant indicated he himself was not a violent person, but would "stand up for my rights." As defendant testified, he did not hold a grudge against Dickerson, even though Dickerson had helped someone break into his room the day before the shooting. According to defendant, when Dickerson and the other man burglarized his room, they took only some change in a water jug, which defendant testified "wasn't that much money." The next day, April 10, 2020, defendant told the other residents at the motel that they should keep an eye out, because Dickerson was breaking into rooms there.

Defendant testified that, on April 10, 2020, a woman came to his room and knocked on his door, saying Dickerson wanted to talk to him. She pointed to room 111, where Dickerson was visiting. Defendant went back into his room on the second floor of the motel and put on his jacket, which had a gun in the pocket. He came back out, at which point Dickerson was inside room 111. Video then shows defendant standing at the top of the stairs, from which room 111 is visible, for approximately a minute. Defendant then starts down the stairs when Dickerson came back out to work on his bike.

Defendant approached Dickerson as Dickerson's back was to him, while he was working on his bike. According to defendant, when he approached Dickerson and got his attention, Dickerson confronted him about telling other residents of the motel that Dickerson had broken into defendant's room. Defendant testified he "knew what type of person" Dickerson was, identifying him as a "bully." Defendant then accused Dickerson of stealing from him. According to defendant, "[t]he exact words came out of his [Dickerson] was I don't like you. You think you're better than the rest of the family. And

6.

I'mma stay taking from you. I said no, I'm not going to let you keep on taking from me, cousin." Defendant said that as this exchange was occurring, Dickerson came towards him and defendant drew the gun. Defendant testified he told Dickerson "do not walk up on me cuz I'm scared of you," and "[i]f you come up, I'mma have to use this." As defendant testified, Dickerson responded, "if I get that gun out your hand, you know what I'mma do to you." After that, Dickerson "flinched" three or four times, the last of which was "a little bit harder than what he usually did …." Defendant asserted that he believed Dickerson was then coming after him to take the gun, so defendant fired. Video evidence showed the entire altercation lasted only a few seconds.

According to defendant, after he shot Dickerson, he approached another man and asked for help putting Dickerson, who weighed almost 300 pounds, in the car, which the other man refused. Defendant claims he told the man he was going to take his cousin to the hospital; however, E.L. told detectives he didn't know why defendant needed help, and did not mention anything about a hospital. After that, defendant fled because of his prior experiences "running into the law, I went into flight mode. I said well, I'mma— they got to catch me now. I'm not going to sit there and let them take me to jail …." According to defendant, he did not flee because of the shooting, but rather because he knew the officers would arrest him for drug possession, and he testified he told his mother he would turn himself in after he had a chance to talk to his children and explain what was happening.[4]

Defendant was arrested five days after the shooting, on April 15, 2020, at another motel in Bakersfield.

---

[4]     Defendant alternately testified that he told his mother he would not turn himself in, and "[t]hey got to catch me."

# DISCUSSION

## I.     The Trial Court Did Not Err in Denying Defendant's Second *Marsden* Motion

Defendant first argues the trial court erred by denying his second motion to dismiss his appointed counsel pursuant to *Marsden, supra*, 2 Cal.3d 118.  According to defendant, the court should have found, given defendant's repeated complaints, that the communication between him and his counsel had irretrievably broken down and they were now embroiled in an irreconcilable conflict.  As discussed below, we believe the trial court appropriately exercised its discretion in denying the motion.

### A.     *Applicable Law*

Criminal defendants have a right not only to representation by an attorney, including an appointed one, if they cannot afford to hire one themselves, but effective representation by an attorney who is competent.  (*Gideon v. Wainwright* (1963) 372 U.S. 335, 344–345; *Strickland v. Washington* (1984) 466 U.S. 668, 686.)  This does not entitle a criminal defendant to their choice of appointed attorney.  (*People v. Hernandez* (2012) 53 Cal.4th 1095, 1106.)  However, if a defendant raises the issue, the trial court must listen to and consider the defendant's explanations as to why their counsel cannot effectively represent them, and failing to do so is reversible error where it prejudices the defendant.  (*Marsden, supra*, 2 Cal.3d at p. 126.)

"A defendant is entitled to have appointed counsel discharged upon a showing that counsel is not providing adequate representation or that counsel and defendant have become embroiled in such an irreconcilable conflict that ineffective representation is likely to result."  (*People v. Jones* (2003) 29 Cal.4th 1229, 1244–1245.)  The decision about whether appointed counsel should be discharged is reviewed by us under a deferential abuse of discretion standard.  (*Id.* at p. 1245; *People v. Earp* (1999) 20 Cal.4th 826, 876; *People v. Berryman* (1993) 6 Cal.4th 1048, 1070, overruled on other grounds in *People v. Hill* (1998) 17 Cal.4th 800, 822–823.)  A *Marsden* motion should only be granted when a defendant has made a """"substantial showing""""" that constitutionally

8.

inadequate representation is likely to result. (*People v. Streeter* (2012) 54 Cal.4th 205, 230.) Denial is not an abuse of discretion unless the defendant can show the failure to replace counsel ""would substantially impair the defendant's right to assistance of counsel."" (*Ibid.*) Further, because the trial court has direct observation of the defendant and his counsel, the court is entitled to credit the attorney's explanations over the defendant's, if it finds the attorney more credible. (*People v. Taylor* (2010) 48 Cal.4th 574, 600.) Otherwise, "[i]f a defendant's claimed lack of trust in, or inability to get along with, an appointed attorney were sufficient to compel appointment of substitute counsel, defendants effectively would have a veto power over any appointment, and by a process of elimination could obtain appointment of their preferred attorneys, which is certainly not the law." (*People v. Jones, supra*, at p. 1246.)

### B. Discussion

In this case, defendant made two oral *Marsden* motions to request that new counsel be appointed. On June 7, 2021, defendant asserted to the court his counsel had failed to bring him the videos the prosecution intended to use against him. Defense counsel explained to the court that he had, up to that point, been unable to play the videos from the files sent by the prosecutor's office. Defense counsel affirmed he intended to provide defendant with the videos once he had a working copy. The court denied the motion without prejudice.

Defendant made a second *Marsden* motion on December 15, 2021. According to defendant, his counsel had not met with him enough times, had failed to file motions to exclude evidence, and had failed to adequately investigate the case, including failing to consult with the "appropriate experts." Defense counsel noted he had personally visited defendant several times, and his investigator had visited with defendant several additional times. Counsel and his team had investigated the case, and located a few witnesses from the motel who were willing to testify against Dickerson in the case. According to defense counsel, he did not know what motions defendant wanted him to file, other than generally

saying defendant wanted "a motion to get rid of the evidence." Defendant clarified that he wanted counsel to file a motion to exclude the evidence because his cotenant, L.S., who was sleeping in the room when police came after the shooting, had not been charged with any crimes. Defendant also claimed there should be more video evidence than what was provided by the prosecution. The trial court denied the motion orally, citing a number of cases on the record and finding generally that each of these factors was insufficient to warrant granting the motion.

On appeal, defendant claims the trial court erred, not because defendant's complaints showed counsel was performing inadequately, but rather because these complaints, taken in their totality, showed defendant and his counsel were "embroiled in an irreconcilable conflict such that ineffective representation was likely to result." First, we note defendant did not complain of an irreconcilable conflict with his counsel in the trial court, and has thus forfeited such a claim. (*People v. Streeter, supra*, 54 Cal.4th at pp. 230–231.) Setting aside forfeiture and reviewing this matter deferentially, we would still affirm the court's decision. The court was entitled to believe defendant's counsel that both he and his investigator had met with defendant multiple times up to that point, which was still the better part of a year prior to trial. Defendant's proposed motion to suppress evidence merely because the other resident of the room was not criminally charged would have been meritless, since prosecutorial discretion is not a reason to exclude evidence. (See *People v. Ramirez* (2022) 13 Cal.5th 997, 1139 ["The prosecutor has broad discretion to prosecute a defendant for a particular crime so long as there is probable cause to believe that the defendant is guilty and the prosecution is not motivated by vindictiveness or invidious discrimination. [Citation.] Moreover, as a general matter, the law does not require consistency in results between different criminal defendants in different prosecutions."].) Defendant did not identify any areas of investigation that were lacking, nor any missing expert testimony, either in the trial court or in briefing here, nor are any such deficiencies obvious to us. There was little dispute about the core facts of

the case: defendant did not deny shooting Dickerson and there was video evidence of the shooting.[5] Defendant's sole argument at trial was that the shooting occurred in self-defense. At the second *Marsden* hearing, counsel stated, "Mr. Hardison and I have discussed this many times, and he knows … the only defense he has is self-defense." Defendant did not disagree with this statement, and never indicated he wished to pursue a different defense or what such a defense would be. There is nothing in the record that shows defendant's right to assistance of counsel was substantially impaired, despite his generalized complaints about his attorney.

It also bears noting that the second *Marsden* hearing occurred approximately 10 months prior to trial, and there were no apparent further complaints about defendant being unable to meet with his defense counsel, disagreeing with counsel's strategy, or refusing to cooperate with his attorney. Given this, there is not evidence in the record to show the trial court abused its discretion by denying this *Marsden* motion. Accordingly, we affirm the trial court.

## II. The Trial Court Did Not Err in Refusing to Provide a Heat of Passion Instruction for Voluntary Manslaughter

Defendant's second assignment of error asserts the trial court refused to provide a jury instruction on heat of passion to support a voluntary manslaughter conviction. Defendant did request such an instruction. However, the evidence in the record, including defendant's own testimony, points solely to self-defense. Because there was not substantial evidence supporting a heat of passion instruction, the court acted appropriately in refusing it.

### A. *Applicable Law*

""""In determining whether error has been committed in giving or not giving jury instructions, we must consider the instructions as a whole … [and] assume that the jurors

---

[5] Defendant acknowledged guilt for the other four charges related to drug and weapon possession during closing arguments.

11.

are intelligent persons and capable of understanding and correlating all jury instructions which are given." [Citation.]'" (*People v. Ramos* (2008) 163 Cal.App.4th 1082, 1088.) A trial court has a duty to instruct on a lesser included offense or an affirmative defense "only when there is substantial evidence" to support that defense theory of the case, "not when the evidence is 'minimal and insubstantial.'" (*People v. Barton* (1995) 12 Cal.4th 186, 201, fn. omitted; see *In re Christian S.* (1994) 7 Cal.4th 768, 783.) "Substantial evidence is … evidence that a reasonable jury could find persuasive." (*People v. Barton, supra*, at p. 201, fn. 8.)

We review de novo whether the trial court erred in failing to give a requested instruction. (*People v. Waidla* (2000) 22 Cal.4th 690, 733; *People v. Hernandez* (2013) 217 Cal.App.4th 559, 568; *People v. Shaw* (2002) 97 Cal.App.4th 833, 838.)

### B.     Discussion

Defendant claims the trial court erred by failing to provide an instruction based on sudden quarrel and a heat of passion theory of voluntary manslaughter, namely CALCRIM No. 570.[6] That instruction is appropriate when there is substantial evidence

---

[6]     That pattern instruction reads: "A killing that would otherwise be murder is reduced to voluntary manslaughter if the defendant killed someone because of a sudden quarrel or in the heat of passion.

"The defendant killed someone because of a sudden quarrel or in the heat of passion if:

"1.     The defendant was provoked;

"2.     As a result of the provocation, the defendant acted rashly and under the influence of intense emotion that obscured (his/her) reasoning or judgment;

"AND

"3.     The provocation would have caused a person of average disposition to act rashly and without due deliberation, that is, from passion rather than from judgment.

"Heat of passion does not require anger, rage, or any specific emotion. It can be any violent or intense emotion that causes a person to act without due deliberation and reflection.

"In order for heat of passion to reduce a murder to voluntary manslaughter, the defendant must have acted under the direct and immediate influence of provocation. While no specific type of provocation is required, slight or remote provocation is not sufficient. Sufficient provocation may occur over a short or long period of time.

from which a jury could determine the defendant's "'reason was, at the time of his act, so disturbed or obscured by some passion … to such an extent as would render ordinary men of average disposition liable to act rashly or without due deliberation and reflection, and from this passion rather than from judgment.'" (*People v. Beltran* (2013) 56 Cal.4th 935, 939.) Put differently, the "'heat of passion'" defense theory exists where "the killer's reason was actually obscured as the result of a strong passion aroused by a 'provocation' sufficient to cause an '"ordinary [person] of average disposition … to act rashly or without due deliberation and reflection, and from this passion rather than from judgment."'" (*People v. Breverman* (1998) 19 Cal.4th 142, 163, disapproved on other grounds in *People v. Schuller* (2023) 15 Cal.5th 237, 260, fn. 7.) "The provocative conduct by the victim may be physical or verbal, but the conduct must be sufficiently provocative that it would cause an ordinary person of average disposition to act rashly or without due deliberation and reflection." (*People v. Lee* (1999) 20 Cal.4th 47, 59.)

Here, there was not sufficient evidence to support such an instruction. Defendant claims this instruction should have been given because the evidence showed that, when he went to confront Dickerson about stealing from him, Dickerson responded in a hostile manner and the two "got into a heated argument," which resulted in defendant shooting Dickerson. Setting aside that this was inconsistent with defendant's main theory of the case that he shot Dickerson out of fear, not passion or anger, it is inconsistent with

---

"It is not enough that the defendant simply was provoked. The defendant is not allowed to set up (his/her) own standard of conduct. You must decide whether the defendant was provoked and whether the provocation was sufficient. In deciding whether the provocation was sufficient, consider whether a person of average disposition, in the same situation and knowing the same facts, would have reacted from passion rather than from judgment.

"[If enough time passed between the provocation and the killing for a person of average disposition to 'cool off' and regain his or her clear reasoning and judgment, then the killing is not reduced to voluntary manslaughter on this basis.]

"The People have the burden of proving beyond a reasonable doubt that the defendant did not kill as the result of a sudden quarrel or in the heat of passion. If the People have not met this burden, you must find the defendant not guilty of murder." (CALCRIM No. 570.)

13.

defendant's own testimony at trial. Defendant specifically testified he shot Dickerson. "[f]or my protection, yes. I was in fear for my life .…" Defendant repeated this testimony consistently, and maintained he acted solely in self-defense, because he was afraid of Dickerson. Defendant testified he did not act out of revenge, or because he bore a grudge, and downplayed any anger he might have felt about the burglary, noting Dickerson only took a few coins from him.

The court concluded the video of the incident, combined with defendant's testimony that he acted out of fear, did not support an instruction based on a sudden quarrel and a heat of passion defense. Again, the record provided to us on appeal does not include the videos played at trial. It was defendant's obligation to ensure such videos were included in the record, if he wished for us to review them. (Cal. Rules of Court, rule 8.224(a)(1); *People v. Chubbuck* (2019) 43 Cal.App.5th 1, 12.) Absent this, we are left only with defendant's testimony and witness's descriptions of what was depicted on the videos. Defendant described the videos as showing a very brief encounter between him and Dickerson, lasting only seconds. Defendant's testimony was unequivocal that he only shot Dickerson out of fear he was going to be harmed or killed. Defendant never testified he was overly emotional or angry or upset, nor that his emotions caused him to lose the ability to see reason, and indeed commented nothing important was stolen from his room. Instead, defendant clearly and consistently testified he acted reasonably to protect himself. Absent evidence that defendant acted in response to some provocation by Dickerson—either the theft from defendant's room the day prior or something said during the very brief conversation immediately precipitating the shooting—there is no evidence to support the giving of CALCRIM No. 570. Defendant did not testify to such an emotional reaction to some provocation, nor was it apparently depicted on the videos played for the jury, based on the descriptions of them in the record. We affirm the trial court.

**III.  The Trial Court Did Not Err in Dismissing Jurors Nos. 9 and 12 from Jury Service**

According to defendant, the trial court also erred by dismissing Jurors Nos. 9 and 12 from jury service during deliberations without good cause.  As the discussion below will show, the court had good cause to replace Jurors Nos. 9 and 12 in this case, given the personal animosity between the two that emerged separate and apart from the merits of the case.

### A.    Applicable Law

"If at any time, whether before or after the final submission of the case to the jury, a juror dies or becomes ill, or upon other good cause shown to the court is found to be unable to perform his or her duty, or if a juror requests a discharge and good cause appears therefor, the court may order the juror to be discharged and draw the name of an alternate, who shall then take a place in the jury box …."  (§ 1089.)  While this statute is most commonly applied where a juror becomes physically or emotionally unable to continue deliberations, it has also been applied to permit the removal of a juror who refuses to deliberate.  (*People v. Cleveland* (2001) 25 Cal.4th 466, 475 (*Cleveland*).)  Trial-related stress can be a reason to remove a juror who can no longer continue to deliberate.  (*People v. Powell* (2018) 6 Cal.5th 136, 156; *People v. Thompson* (2010) 49 Cal.4th 79, 137–138.)  Further, it has long been recognized that trial courts possess the inherent authority to ensure the orderly administration of justice in their courtrooms.  (*Elkins v. Superior Court* (2007) 41 Cal.4th 1337, 1351; *People v. McKenzie* (1983) 34 Cal.3d 616, 626–627 abrogated on other grounds by *People v. Crayton* (2002) 28 Cal.4th 346, 361; *People v. Ruiloba* (2005) 131 Cal.App.4th 674, 690.)  "[A] trial court's inquiry into possible grounds for discharge of a deliberating juror should be as limited in scope as possible, to avoid intruding unnecessarily upon the sanctity of the jury's deliberations. The inquiry should focus upon the conduct of the jurors, rather than upon the content of the deliberations."  (*Cleveland, supra*, at p. 485.)

The "'ultimate decision whether to retain or discharge a juror … rests within the sound discretion of the trial court.'" (*People v. Sattiewhite* (2014) 59 Cal.4th 446, 486.) Our Supreme Court has noted "caution must be exercised in determining whether a juror has refused to deliberate." (*Cleveland, supra*, 25 Cal.4th at p. 475.) "'In determining whether juror misconduct occurred, "[w]e accept the trial court's credibility determinations and findings on questions of historical fact if supported by substantial evidence."'" (*People v. Linton* (2013) 56 Cal.4th 1146, 1194.) We will uphold a lower court's discretion to remove a juror so long as the "'the record supports the juror's disqualification as a demonstrable reality.'" (*People v. Williams* (2015) 61 Cal.4th 1244, 1262.) This language denotes that the trial court's decision must be supported by "a somewhat stronger showing than what is ordinarily implied by that standard of review …." (*People v. Wilson* (2008) 44 Cal.4th 758, 821.) "'The demonstrable reality test "requires a showing that the court as trier of fact *did* rely on evidence that, in light of the entire record, supports its conclusion that [disqualification] was established." [Citation.] To determine whether the trial court's conclusion is "manifestly supported by evidence on which the court actually relied," we consider not just the evidence itself, but also the record of reasons the court provided. [Citation.] In doing so, we will not reweigh the evidence.'" (*People v. Williams, supra*, at p. 1262.) This court gives "deference to the trial court's factual determinations, based, as they are, on firsthand observations unavailable to us on appeal." (*People v. Barnwell* (2007) 41 Cal.4th 1038, 1053.)

### B.    Discussion

Jury deliberations began in this case on October 17, which was a Monday afternoon. The next morning, October 18, the jury requested copies of certain transcripts, and then later, in the afternoon, requested a readback of defendant's testimony. The following day, October 19, the jury asked the judge to explain what was meant by the term "lawful excuse," and in doing so, uncovered a mistake made in the jury instructions,

which was thereby corrected. Late in the morning of Thursday, October 20, the jury submitted a note to the judge saying, "We cannot come to an agreement on Count 1. Count 2–5, we agree. What are the next steps?"

After receiving that note, the trial court proceeded to call in certain of the jurors to discuss the state of deliberations.[7] It began with Juror No. 6, the foreperson of the jury, who was asked whether there was anything that should be brought to the court's attention. The conflict between Jurors Nos. 9 and 12 came up almost immediately. Juror No. 6 stated "there have been emotions and feelings and disrespect and arguments that have come up which have not created a safe space for everyone to feel like they can speak their mind, to speak their thoughts, and since, we have had … closure to some minds." The court confirmed that the lack of a safe space and disrespect was curtailing discussions, from Juror No. 6's point of view, and involved Jurors Nos. 9 and 12.

The court then called Juror No. 1, who indicated they had also witnessed disrespect in the jury room that was "[m]ostly directed at one person," but which was "affecting more than one person" in the room. Juror No. 1 indicated he had seen Juror No. 12 be disrespectful. The court then asked, "Is it a safe space to talk about your opinion, how you've seen facts at this time?" Juror No. 1 responded, "I don't—no. That person has not made it to where nobody is afraid to talk. [¶] … [¶] … But make it uncomfortable where it becomes where, you know, there's—there's communication and there's talk about certain things and then when—when things are coming out of that person's mouth, you know, like under their breath they're saying it loud enough to—to where everybody can hear and then everybody just kind of shuts down to where all right we're better off not saying anything because this might escalate into something else and where everybody is just trying to avoid that." Juror No. 1 indicated some jurors were

---

[7] The court appropriately admonished each of the jurors not to discuss the substance of their conversations about the merits of the case in their answers to its questions.

"confrontational," and used "cuss words."  Juror No. 1 indicated the conflict between these jurors first began on Tuesday, the second day of deliberations.  Juror No. 1 indicated they believed Jurors Nos. 3 and 4 might be holding back in deliberations because of a desire to keep the confrontation from escalating.

Juror No. 4 was then questioned by the court.  He indicated there was an "intimidation factor" occurring, where "some of us don't want to speak over each other but some of us just don't care for that fact of I'm going to talk over you."  Juror No. 4 stated he had not personally been the target of any disrespect.  Juror No. 4 affirmed he felt able to deliberate and share his opinion.  After Juror No. 4 was returned to the jury room, the court agreed with defense counsel's characterization that "Juror Number 4 is by far the smallest person on this jury and number 12 is the largest.  And he didn't feel intimidated whatsoever."

The court then called in Juror No. 3, who explained the genesis of the dispute was that Juror No. 12 had called Juror No. 9 "an asshole."  Juror No. 3 indicated the jury was still willing to deliberate and voice their opinions, and believed the jury room was still "a safe space for everybody to voice their opinions."  Juror No. 3 disclosed that the jury had moved the jurors at issue to different seats in the room to help resolve the conflict.

At this point, the trial court discussed the issue with Jurors Nos. 9 and 12.  Before calling Juror No. 12, however, the court noted, "Juror 9 is a bit upset out there because he—he was told to be—was apparently had said he wasn't coming back.  He had had enough.  And that was the person who was called an asshole.  [¶]  My understanding is every time deputy goes out there he is complaining he should have been taken first."

Juror No. 12 stated the deliberations were "contentio[us]," and said, "I'm okay with it.  I can see other people having problems with it."  Juror No. 12 admitted he had engaged in "name calling" with another juror, explaining it was in response to another juror "making statements questioning my intellect, ability to read," after which he called the other juror "an asshole."  This was because he felt he "was being attacked verbally

18.

and my—my intelligence questioned by the man. I felt I was defending myself if anything." Juror No. 12 recalled that he had called the other juror an "asshole" twice, although he noted Juror No. 9 told him it had happened five times. He also stated he said something under his breath about yet another juror. Juror No. 12 acknowledged his behavior might have had the effect of closing down other jurors from being willing to participate in deliberations. Juror No. 12 ultimately, however, defended his actions, saying, "Like I said, I am going to defend myself. There's no—there's no way I'm going to let someone walk over me like that even in a jury room.… I felt the line was crossed and I defended myself." According to Juror No. 12, he would not be "influenced one way or the other how I was going to vote or how I do vote based on if I agree or disagree with the man at all."

The court then took testimony from Juror No. 9, who immediately stated he had been called an "asshole" "[a]bout five times [¶] … [w]ithin about two minutes." Juror No. 9 stated almost immediately, "I don't have to—I do not want to be here.… I don't have to be here for this. I don't have to put up with that.… So I'm asking the Court to let me go." Juror No. 9 acknowledged he and Juror No. 12 had a difference of opinion about what two different words in a jury instruction meant, and Juror No. 9 told Juror No. 12 "he should look in the dictionary and asked him if he could read." Juror No. 9 explained that, after this confrontation, "I was asked to move the other—to the other end of the room because the other jurors felt threatened that the two of us were going to go at it or something so I finally said okay I'll move. And I went [to] the other end. First I told him I was not intimidated by him." Juror No. 9 stated he told Juror No. 12, "you can't talk to me like that … two or three times." Juror No. 9 said that, after the confrontation, the other jurors shut down "for a little while," and then "they started back up and got talking again."

According to Juror No. 9, the issue was that Juror No. 12, the "first two days we're in there he is standing up" and "[t]owering over everybody. And any time anybody else

19.

said something he has to jump in.  He has to try to control the whole conversation whatever it is.  And I don't need to be there for that."  Juror No. 9 reiterated that he did not "have to put up with" Juror No. 12 "cussing me out."

After discussing with Juror No. 9, the court recalled Juror No. 12.  The court indicated it understood the jury was concerned, after this verbal confrontation, that "there might be a fight" or physical confrontation, which Juror No. 12 agreed with.  Juror No. 12 agreed after the confrontation, he and Juror No. 9 had moved seats after being requested to do so.  The court then asked Juror No. 12 whether, once the two were separated, all jurors resumed discussions, to which Juror No. 12 paused before replying, "That's interesting."[8]  Ultimately, Juror No. 12 said, "I can only speak for myself.  I—I don't know about how others felt but I feel others still—everyone in the room still contributed to discussion, yes."

The trial court at this point clearly felt the personal hostility between these two jurors prevented further deliberations, and based its decision on that hostility.  While hearing arguments from counsel on whether to dismiss both jurors, defense counsel argued they should not be dismissed because the jurors indicated they were continuing to deliberate, to which the court said, "Yeah.  But the Court hasn't put their head in the sand," indicating it made contemporary observations of the witnesses that belied their verbal testimony.  The court noted one of the jurors would not look at the judge, and indicated his "body language" suggested he was not being forthcoming.  The court stated that, based on the initial message it received from the jury, its inclination would have been to send back further instructions to continue deliberating or choose from a few options, including receiving further argument.  However, "[g]iven the discontent that was brought to the Court's attention, the Court then had to react to that to see if that was going to be a feasible situation."  The court noted that, based on the testimony it had received,

---

**8**  The prosecutor characterized this response as coming with an "extended pause."

the jury room at this point was not a "safe environment." Jurors Nos. 9 and 12's behavior had "no place in a jury room," and the "way they treated each other which the Court felt definitely had a residual effect on other people." The Court observed that Juror No. 1, who was a prison guard, and "deals with that type of behavior all the time," was "concerned," noting Juror No. 1 "could certainly handle himself," but still had felt the need to physically separate Jurors Nos. 9 and 12. The court said it "found the behavior aggressive," and therefore would discharge Jurors Nos. 9 and 12 from the jury and replace them with alternates. In doing so, the court noted that the two would not be allowed to go into the jury room at the same time to collect their belongings, which would be "problematic together if nothing else," noting "[t]hese two may get into it. And I don't want to have anyone be arrested for battery or something. That's not going to happen. And we will make sure it doesn't happen but the Court is concerned at some level." After discharging the two jurors, the court noted that Juror No. 9 made a statement as he left the courtroom, observing, "Juror Number 9 basically stated … I'm not going to put up with that situation. Basically he is referring to what happened in the jury room. That's how the Court took it as he left."

It appears both Jurors Nos. 9 and 12 were large men. The trial court characterized Juror No. 12 as "physically well built," and Juror No. 9 as a "big guy height wise" who could "look after [himself]." Juror No. 9 described Juror No. 12 as approximately six feet eight inches tall. The prosecutor characterized Juror No. 12 as "probably close to 400 pounds and over six feet tall." The court later referred to him as being six feet five or six inches tall, and "certainly a big gentleman physically."

Here, the misconduct between Jurors Nos. 9 and 12 is a demonstrable reality from the record before us. There was little variance among the testimony of the jurors about the core of the dispute: Juror No. 9 insulted Juror No. 12 by asking him if he could read, Juror No. 12 responded by swearing at Juror No. 9, and following this dispute, the rest of the jury felt it necessary to physically separate the two of them. The dispute between the

21.

parties comes from whether the conflict between Jurors Nos. 9 and 12 was sufficient misconduct to make further deliberations impossible, not due to an honest disagreement about the state of the evidence, but because of the personal enmity and risk of physical violence between the two jurors. While the jurors did state deliberations continued following this conflict, the trial court made observations based on their body language and its assessment of their candor and credibility, and concluded the jury could not adequately continue to deliberate with the two problematic jurors remaining. The ability to observe witnesses' testimony and demeanor is a significant part of why appellate courts defer on factual issues, and sufficient evidence from the record has not been identified to undermine the court's determination of these jurors' credibility.

In sum, the court had reasonable concerns the conflict between the two jurors could become physically violent, a conclusion apparently shared by the rest of the jurors. It goes almost without saying a court need not wait for violence to erupt amongst the jury before it intervenes. The court was within its discretion to conclude the risk of a physical confrontation between two jurors over their treatment of each other was misconduct that prevented the jury from focusing on the evidence and the law. Both jurors were clearly large men, suggesting they might not be easily separated if a fight began and increasing both the risk and perceived risk of substantial injury to each other, the other jurors, and the court's property. Because the risk of such a confrontation is apparent on the record in front of us, the misconduct is a demonstrable reality. The trial court appropriately discharged its discretion by dismissing these two jurors.

## IV. The Trial Court Did Not Coerce a Guilty Verdict From the Remaining Jurors After Dismissing Jurors Nos. 9 and 12

Lastly, defendant argues that, even if it was not an abuse of discretion for the trial court to conclude Jurors Nos. 9 and 12 committed misconduct, the fact of their dismissal improperly coerced a guilty verdict from the remaining jurors. For the reasons that follow, we find no coercion to the remaining jurors exists here.

"Except as provided by law, the jury cannot be discharged after the cause is submitted to them until they have agreed upon their verdict and rendered it in open court, unless by consent of both parties, entered upon the minutes, or unless, at the expiration of such time as the court may deem proper, it satisfactorily appears that there is no reasonable probability that the jury can agree." (§ 1140.) In order to declare a hung jury, "[t]he trial court is therefore required to determine in its 'sound discretion' whether there is a reasonable probability of agreement by the jury." (*People v. Whaley* (2007) 152 Cal.App.4th 968, 980.) This sometimes involves questioning some or all of the jurors to ascertain the extent of the impasse, and whether further deliberations are likely to resolve the stalemate. (See *People v. Engelman* (2002) 28 Cal.4th 436, 443 [finding precedent had found secrecy of jury deliberations "*may* give way to reasonable inquiry by the court when it receives an allegation that a deliberating juror has committed misconduct"]; *People v. Sheldon* (1989) 48 Cal.3d 935, 958.) While a court must therefore sometimes inquire about the state of deliberations, it "must exercise its power … without coercion of the jury, so as to avoid displacing the jury's independent judgment 'in favor of considerations of compromise and expediency.'" (*People v. Miller* (1990) 50 Cal.3d 954, 994.)

As part of due process and to protect the right to an impartial jury, a trial judge may not question or instruct the jury in such a way that coerces it into finding for or against any party, or even compels it to reach a unanimous decision at all. (See *United States v. United States Gypsum Co.* (1978) 438 U.S. 422, 459–462 [improper coercion shown where judge met ex parte with jury foreperson and implied he wanted a verdict "'one way or the other'"]; *Jenkins v. United States* (1965) 380 U.S. 445, 446 [improperly coercive for trial judge to tell jury "'You have got to reach a decision in this case.'"].) The determination of whether such coercion exists in any given case is contextual, and must be based on "all the circumstances." (*Jenkins, supra*, at p. 446; see *Lowenfield v. Phelps* (1988) 484 U.S. 231, 237–241.) California has recognized a related rule, finding

23.

the giving of so-called *Allen*[9] instructions improperly coercive. (See *People v. Gainer* (1977) 19 Cal.3d 835, 842–843, abrogated in part by *People v. Valdez* (2012) 55 Cal.4th 82, 163.) California nonetheless still permits questioning of jurors and instructing deadlocked juries to continue deliberating, so long as the circumstances of the instruction do not improperly coerce the jury into returning any particular verdict. (*People v. Sheldon, supra*, 48 Cal.3d at pp. 959–960; *People v. Neufer* (1994) 30 Cal.App.4th 244, 254.)

The circumstances of this case do not suggest the court's questioning of the jurors or its ultimate substitution of two alternates had an improperly coercive effect on the jury's outcome. At the point at which the jury first disclosed via note that it was unable to reach a decision on count 1, the trial court called the jury foreperson, Juror No. 6, in to discuss the situation and to determine whether further deliberation was likely to resolve the impasse. Almost immediately, Juror No. 6 revealed the existence of a significant interpersonal conflict largely unrelated to the merits of the case. Between the testimony of Jurors Nos. 1, 3, 4, and 6, it became clear the conflict arose after Juror No. 12 perceived Juror No. 9 as insulting his intelligence, and began cursing at Juror No. 9. The conflict was significant enough the remaining jurors deemed it necessary to create physical separation between the two disputing jurors, both of whom were large men. Every juror with whom the court spoke corroborated the basic account of the exchange and the subsequent actions of the jury. Every juror was admonished not to discuss anything about the substance of the case or whether the juror themselves or the jury as a whole was inclined toward a finding of guilty or not guilty. All of them followed this

---

[9]    In *Allen v. United States* (1896) 164 U.S. 492 (*Allen*), the Supreme Court upheld the trial court's additional instruction, following the jury's indication it had reached an impasse, that extolled the jurors in the numerical minority to reconsider their view of the case, in the interest of reaching a unanimous verdict. (*Id.* at pp. 501–502.) *Allen* charges are commonly used in such circumstances in federal court, although there are a number of restrictions on their use intended to limit jury coercion. (See, e.g., *United States v. Williams* (9th Cir. 2008) 547 F.3d 1187, 1205–1207.)

admonishment, and the merits of the case were not discussed.  After the court spoke to the above jurors and heard from counsel, the court elected to dismiss both jurors engaged in the conflict, and told the remaining jurors simply, "We're going to dismiss Juror Number 9 and 12 at this time."  It instructed the remaining jurors, "Do not consider this substitution for any purpose."  Once the alternates were substituted in, the jurors were further instructed they must "begin your deliberations again from the beginning" and "set aside and disregard all past deliberations ….  Each of you must disregard the earlier deliberations and decide the case as if those earlier deliberations had not taken place."

In this context, given the significant animosity that clearly existed between Jurors Nos. 9 and 12, and which every juror was obviously aware of, there was no doubt the remaining jurors understood these jurors were dismissed for their untoward and hostile conduct toward each other, not for their substantive views on the case.  The jurors who were spoken to by the court were admonished not to discuss the merits of the case, and they did not.  Therefore, they would not have assumed a juror's view on the merits of the case was the reason for the dismissal from the jury, but rather would have understood the dismissal was based on the personal hostility between these two men.

The lack of coercion is confirmed by the fact that jury deliberations resumed on Friday, October 21, with the two alternates, and did not conclude quickly or swiftly.  On the morning of Monday, October 24, the jury sent a note to the court requesting a readback of the prosecutor's closing statement on the concepts of willfulness, deliberateness, and premeditation, or, in the alternative, to review the demonstratives used in the closing argument.[10]  That afternoon, the reconstituted jury sent a further note, again saying it was unable to come to agreement on count 1, and asking what it should do next.  The trial court instructed the jurors to continue deliberating, and offered several

---

[10]     The jury was told in response to reread certain instructions, and was not provided with a copy of the prosecutor's closing statement or demonstratives.

options for the jury to choose from if they thought it might assist in deliberations, namely providing additional instructions, clarifying previous instructions, or hearing additional argument from the attorneys. The following morning, Tuesday, October 25, the jury requested closing arguments related to count 1 to be presented again. The attorneys then presented additional arguments on count 1. That afternoon, at approximately 1:45 p.m., the jury indicated to the court it had reached a verdict on all counts. Thus, even after jury deliberations began again with two alternate jurors, the jury *still* could not initially come to consensus on count 1, and required additional argument from the attorneys prior to convicting defendant. This strongly implies the jurors did not feel coerced by the court to come to any particular verdict, or even come to a verdict at all, and that there were opposing views amongst members of the reconstituted jury that they felt comfortable expressing. We find that neither the questioning of the jurors nor the dismissal of Jurors Nos. 9 and 12 in this case had any coercive effect.

## DISPOSITION

The trial court's judgment is affirmed.


MEEHAN, J.

WE CONCUR:


LEVY, Acting P. J.


PEÑA, J.

26.